WILL DOWDY *v.* STATE COMPENSATION COMMISSIONER *et al.*

(No. 7321)

Submitted May 25, 1932. Decided June 7, 1932.

*Hubbard & Bacon* and *A. L. Russell,* for appellant.

*Howard B. Lee,* Attorney General, *R. Dennis Steed,* Assistant Attorney General, for State Compensation Commissioner.

*Dillon, Mahan & Holt,* for Harvey Coal & Coke Co.

WOODS, JUDGE:

Will Dowdy was injured May 4, 1918, by a slate fall, the employer's office copy of its report of the accident (the original having been destroyed in the Capitol fire of 1921) showing a dislocation of the left hip and an extensive contusion of the left knee. Compensation was paid for 8-2/7 weeks, and the claim closed, claimant being reported able to resume labor. The case was re-opened in 1931, and, after a hearing, the commissioner found claimant's present paralytic condition to be the result of an invasion of the central nervous system by Von Recklinghausen's disease, also spoken of as neurofibromatosis, with which claimant has had outward manifestations in the form of multiple tumors on the body since childhood. It is the contention of claimant, however, that his condition, which is accompanied by abnormal reflexes, points to a spinal cord injury caused by the 1918 slate fall. The evidence of such an injury rests upon the testimony of Dr. Hogg, the company physician at the time of the accident, to the effect that there was no visible sign of injury to the back other than contusion, which shows it to be in the lumbar region about the third or fourth vertebra; and a statement by Dr. Coleman that he has some recollection of having made an examination of claimant's back prior to 1921, the date he (Coleman) severed relations with the Beckley Hospital, and that, if his memory serves him right (his records having been destroyed), there was some injury shown to the lumbar spine. Present x-rays failed to reveal any evidence of injury to the bony framework, although testimony was introduced to the effect that there could be an injury to the spinal cord without visible injury to the bony framework encasing it.

The position taken by counsel for claimant before the commissioner, and reasserted on this appeal, is based on the

assumption that it is an established fact that claimant's present condition appeared immediately after the accident. This is, as we read the record, a disputed fact. Dr. Hogg, who, on July 8, 1918, reported claimant as able to return to work, testified that he made the tests that are usual and saw no evidence of spinal cord lesion; that if he had, he would not have sent claimant back to work; and that claimant at that time had the usual limp which would be expected from the hip and knee injury. At the time of the injury and for a great many months thereafter, there was no evidence, so far as Dr. Hogg was able to find, of any pressure on the spinal cord. However he did find pressure on the cord in 1920, which he states was due to neurofibromatosis. The records show that claimant returned to work with his former employer, Harvey Coal & Coke Company, on July 23, 1918, where he worked until October 16, 1918, at a base rate of $4.10, receiving a total wage of $265.67; and that he worked at Prudence for an associated company from November 1, 1918, to March 31, 1919, at a base rate of $4.55, total earnings, $436.23. While not equal to his earnings from January 26, 1918, the date he went to work for Harvey Coal & Coke Company, until the injury, May 4, 1918, which amounted to $316.77, at base rate of $4.55, yet it compares very favorably. Claimant also worked for Cranberry Fuel Company during April and May, 1919; was at Lochgelly and Summerlee from June 5th to September 15, 1919, and back at Cranberry, September 16, 1919, until January 1, 1920. He never worked thereafter, except to operate a popcorn machine in Fayetteville (1922-1930). In November, 1920, mainly through the efforts of Dr. Hogg, claimant was sent to John Hopkins Hospital for an examination. That institution diagnosed his condition as due to Von Recklinghausen's disease with central nervous system involvement. Claimant returned to Harvey, West Virginia, and from there was sent, by his friends, to Hot Springs, Arkansas. In 1922, he settled at Fayetteville. There is much evidence, however, to the effect that claimant had a spastic gait upon his return to work; that he used a cane or crutch; that he had difficulty in dress-

ing himself and in eating. There is evidence that he was hardly able to do anything about the mine at Harvey. As to his ability to work at the other operations, a number of witnesses state that they saw nothing wrong with him except possibly a slight limp, and that he did not use a cane in the vicinity of the mine.

Dr. Stallard, a traumatic surgeon, and Dr. Wilkerson, a specialist in internal medicine, both of Montgomery, found claimant to be suffering from spastic paralysis of both lower extremities, due to lesion of the spinal cord in the vicinity of the upper lumbar spine, while Dr. Wilson, a neurologist, and Dr. Black, both of Charleston, found claimant's condition to be due to an invasion of the central nervous system by neurofibromatosis. The diagnosis of the first two was based on a history that claimant's present condition developed immediately after his injury in the mine, and ignores the fact that Dr. Hogg had pronounced him able to work, and the fact that he worked for a time at various mining operations until January 1, 1930. They eliminated neurofibromatosis because of its slow progressive nature. The Charleston doctors discarded the theory of an alleged injury to the lumbar spine, because their examination revealed a drooping eyelid and an involvement of the upper extremities, which indicated that the brain and upper cord were also affected. Dr. Wilson found from his examination that only two nerve groups of the spinal cord were involved—the same group on the right and left side. He observed that these two columns are so arranged within the cord that no injury could possibly produce damage to both without damage to the other columns lying in close proximity on all sides. In his opinion there are localized tumors all along the pyramidal tract. Dr. Hamilton, of Oak Hill, a general practitioner, after making a study of the disease of neurofibromatosis, gave as his opinion that the claimant had a contusion of the spinal cord and base of the brain with a possible line fracture of the vertebrae column. However, there is no evidence of such an injury.

The commisioner's finding that claimant's present condition is the result of neurofibromatosis forecloses further

debate, by making answer in the negative to the following questions of fact, namely, (1) Was the cord injured in the slate fall? and (2) Did it excite claimant's present condition? *Heaton* v. *Commissioner*, 106 W. Va. 563, 146 S. E. 368. And where doctors differ in their diagnosis on similar facts, an issue is raised for the commissioner's determination. *Martin* v. *Commissioner*, 107 W. Va. 583, 149 S. E. 824. The instant case seems to be stronger than the one last cited in that the several diagnoses, relied on by claimant, were not based upon a complete history, and were limited principally to the lower extremities by reason of an alleged injury to the lumbar spine. As stated in the *Martin* case, while we might have rendered a different conclusion from the evidence had we been called upon to do so, sitting in the first place, we cannot disturb the finding here.

The action of the Commissioner must be affirmed.

*Affirmed.*